25CA1503 Peo in Interest of Ramirez Quevado 12-11-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1503
Pueblo County District Court No. 25MH30011
Honorable Amiel Markenson, Judge

---

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of Kami Ramirez Quevado,

Respondent-Appellant.

---

ORDER AFFIRMED

Division II
Opinion by JUDGE BROWN
Fox and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 11, 2025

---

Cynthia Mitchell, County Attorney, Kate Shafer, Special Assistant County Attorney, Pueblo, Colorado, for Petitioner-Appellee

Tezak Law, P.C., Mary Tezak, Florence, Colorado, for Respondent-Appellant

¶ 1     Kami Ramirez Quevado appeals the district court's order authorizing staff at the Colorado Mental Health Hospital in Pueblo (the hospital) to medicate her without her consent. We affirm.

## I.     Background

¶ 2     Ramirez Quevado was admitted to the hospital in January 2025 after being found incompetent to proceed in a criminal case. She was diagnosed with schizophrenia and severe post-traumatic stress disorder. Her symptoms included hearing voices, episodes of catatonia, intense hypervigilance, and intense discomfort in situations that remind her of her past, extensive abuse.

¶ 3     In early February, the district court granted the State's petition to involuntarily medicate Ramirez Quevado with three medications. However, over the next month and a half, Ramirez Quevado assaulted staff members and fellow patients on nearly twenty different occasions. In late March, the court granted the State's petition to involuntarily medicate her with seven medications. However, in late March and during the first half of April, Ramirez Quevado committed six more assaults, as well as an attempted assault. In late April, the district court granted the State's petition to add an eighth medication — clozapine — which

Ramirez Quevado's psychiatrist at the hospital described as a "last resort" medication (the next step being electroconvulsive therapy, which is much more intrusive).

¶ 4     Three months later, soon before the April order was set to expire, the State filed the petition at issue, seeking authorization to involuntarily medicate Ramirez Quevado with the following six medications:

- three antipsychotic medications — clozapine, olanzapine (Zyprexa), and quetiapine (Seroquel);
- two mood-stabilizing medications — valproate (Depakote) and lithium; and
- propranolol, a blood pressure medication that can be effective in reducing assaultive behavior.

In an affidavit filed with the petition, Ramirez Quevado's psychiatrist at the hospital reported that

- Ramirez Quevado was doing "far better" and hadn't committed any assaults since April;
- "we are [now] tapering off as many meds as possible," with the goal of eventually treating her solely with clozapine and lithium;

- "[w]e need to make sure that she stays on the [other four] medications while we trim them slowly over the months, one by one"; and

- "[i]f she stops a medication too soon she will likely relapse to [become a] danger to others/self."

¶ 5    At the hearing on the petition, the psychiatrist and Ramirez Quevado testified.  The psychiatrist, whom the parties stipulated was an expert in clinical psychiatry, testified that Ramirez Quevado's mental illness constitutes a substantial disorder that grossly impairs her judgment or capacity to recognize reality or to control her behavior.  The psychiatrist reported that Ramirez Quevado had committed more than forty assaults between January and April; he explained that this behavior poses a risk of harm not only to staff members and other patients, but also to Ramirez Quevado herself because patients "want to fight her."

¶ 6    But the psychiatrist testified that, since adding clozapine to Ramirez Quevado's medications, she has improved to the point that she has turned into a "model patient" and a "success story." Specifically, she has not committed any more assaults; she has been "a delight to be with"; she has been participating in group

therapy; and, although she still hears voices "on and off," her PTSD "has virtually disappeared."

¶ 7    The psychiatrist explained his plan for tapering Ramirez Quevado off three of the six medications: first olanzapine (which was already in progress), then quetiapine, and then propranolol. He testified that it would take approximately one month to safely taper off each medication because doing so more quickly would likely lead to relapse in her condition. He also testified that it was possible that she could eventually be tapered off valproate and lithium too.

¶ 8    Finally, the psychiatrist testified regarding side effects that Ramirez Quevado had experienced from the medications, including weight gain, dizziness, and drooling. The psychiatrist explained that clozapine can lower a patient's white blood cell count — a particular concern with Ramirez Quevado because she has a condition called benign ethnic neutropenia, which causes her to have a lower-than-average white blood cell count — but he testified that her white blood cell count has remained within the normal range. The psychiatrist ultimately opined that Ramirez Quevado's need for the medications outweighs the side effects, and that the

failure to medicate her would be more harmful than the risks posed by the medications.

¶ 9     During Ramirez Quevado's testimony, she said that she has psychosis and schizophrenia but that she does not need any medications to treat her conditions. Instead, she testified that she can treat her symptoms with "[c]oping skills" like reading, writing, and drawing. She testified that she does not want to take any medications and will not do so absent a court order. She also testified about the side effects she had experienced from the medications, including weight gain, dizziness, and drooling.

¶ 10    Following the testimony, the district court found that the psychiatrist had testified credibly and persuasively, and it adopted the psychiatrist's opinions. The court then examined each of the four elements of the test from *People v. Medina*, 705 P.2d 961, 973 (Colo. 1985), concluded that the People had met their burden of proving all four elements in this case, and granted the petition to involuntarily medicate Ramirez Quevado.

II.     Applicable Law and Standard of Review

¶ 11    Under the Medina test, a district court may authorize the involuntary administration of medication if the People demonstrate

by clear and convincing evidence that (1) the patient is incompetent to effectively participate in the treatment decision; (2) the treatment is necessary to prevent a significant and likely long-term deterioration in the patient's mental health condition or to prevent the likelihood of the patient causing serious harm to herself or others at the institution; (3) a less intrusive treatment alternative is not available; and (4) the patient's need for treatment is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment.[1]  Id.

¶ 12     Application of the Medina test involves mixed questions of fact and law.  People v. Marquardt, 2016 CO 4, ¶ 8.  We defer to the district court's factual findings if they have record support, while we review the court's legal conclusions de novo.  Id.  Resolving conflicts

---

[1] A different test applies to petitions to administer medication involuntarily for the purpose of restoring competency for a criminal proceeding.  *See People in Interest of R.F.,* 2019 COA 110, ¶¶ 10-15 & n.1 (discussing the test from *Sell v. United States*, 539 U.S. 166, 180 (2003)).  Although Ramirez Quevado was admitted to the hospital for that purpose, the parties agree that the test from *People v. Medina,* 705 P.2d 961 (Colo. 1985), applies here.  Indeed, the petition's stated purposes, and the district court's bases for granting the petition, were (1) to prevent a significant and long-term deterioration in Ramirez Quevado's mental condition and (2) to prevent the likelihood of her causing serious harm to others at the institution.  *See R.F.,* ¶ 11 n.1.

6

in testimony and determining the credibility of the witnesses are matters solely within the province of the district court. People in Interest of Ramsey, 2023 COA 95, ¶ 23.

¶ 13    On a challenge to the sufficiency of the evidence, we must affirm the district court's ruling if the evidence, viewed as a whole and in the light most favorable to the prevailing party, is sufficient to support the court's order. *People in Interest of R.K.L.*, 2016 COA 84, ¶ 13. The testimony of the physician seeking to administer treatment may be sufficient, without more, to satisfy the *Medina* test. *Id.* at ¶ 30.

### III.    Analysis

¶ 14    Ramirez Quevado does not contest the district court's findings that the People met their burden of proving the first, second, and third *Medina* elements. However, she contends that the evidence was insufficient to establish the fourth *Medina* element — that her need for the medications is sufficiently compelling to override any bona fide and legitimate interest she has in refusing to take them.

¶ 15    In analyzing the fourth *Medina* element, a court first determines "whether the patient's refusal is bona fide and legitimate." *Medina,* 705 P.2d at 974. If it is, the court then

determines "whether the prognosis without treatment is so unfavorable that the patient's personal preference must yield to the legitimate interests of the state in preserving the life and health of the patient placed in its charge and in protecting the safety of those in the institution." *Id.*

¶ 16 The district court found that Ramirez Quevado's interests in avoiding the side effects she had been experiencing and the risk of developing a low white blood cell count were bona fide and legitimate. However, the court also found that her side effects have lessened or are expected to lessen in the future, and it noted the ways in which Ramirez Quevado was, or could be, mitigating the side effects. The court also found that despite the primary risk with clozapine — reduced white blood cell count — Ramirez Quevado's white blood cell count had remained normal. The court then balanced that interest against Ramirez Quevado's need for the medications, and it found that "her prognosis without treatment is still so unfavorable, that her personal preference must yield to the legitimate interest of the State in preserving [her] life and health . . . [and] protecting the safety of those in the [hospital]."

¶ 17    The record supports the district court's findings.  To be sure, the evidence shows that Ramirez Quevado's interest in avoiding side effects was bona fide and legitimate.  However, the psychiatrist's testimony, which the district court credited, shows that her side effects had either already improved or were expected to improve in the future:

- In terms of Ramirez Quevado's weight gain, the psychiatrist testified that olanzapine and quetiapine are the two medications she was taking that cause the most weight gain, but in tapering her off those medications over the next two months, "it's possible that the weight gain will go away."
- In terms of her dizziness, he testified that propranolol was "probably the main culprit" but that her dizziness had already gotten "much better."
- In terms of her drooling, he testified that clozapine was causing that, but usually "the drooling stops [after] about six or seven months" on the medication.

¶ 18    The psychiatrist also testified regarding ways to mitigate some of the side effects:

- Metformin helps to mitigate weight gain, and although Ramirez Quevado was taking a minimum dose of that medication, he was encouraging her to increase the dose.

- Atropine drops, which dry the mouth, can alleviate drooling, but Ramirez Quevado stopped taking the drops because she didn't like how they tasted.

¶ 19    We discern no error in the district court's finding that Ramirez Quevado's interest in avoiding side effects was outweighed by her compelling need for medication treatment. The record reflects the gravity of Ramirez Quevado's condition upon her admission to the hospital and during the first three months of her hospitalization. It also reflects her drastic improvement since taking clozapine: the psychiatrist explained that she had transformed into a "model patient" who "should skate through this [hospital] quickly . . . once she gets to a competency exam." The need for Ramirez Quevado to take clozapine to continue to improve and stabilize is compelling and outweighs her interest in avoiding side effects, which either have already improved or are expected to improve in the future.

¶ 20    In arguing that the district court erred, Ramirez Quevado highlights the psychiatrist's testimony describing this as a "record

10

case" in terms of the number of medications she had taken. But the record reflects that the other antipsychotic medications were tried before clozapine because clozapine is a "last resort" antipsychotic medication as it can lower white blood cell count and suppress the immune system. But now that clozapine has proven effective, the psychiatrist's focus is on tapering Ramirez Quevado off as many of the other medications as possible. It is not safe to do that quickly, however; it must be done one medication at a time, one month at a time.

¶ 21 Ramirez Quevado also emphasizes that she has benign ethnic neutropenia, making clozapine particularly dangerous for her to take since it lowers white blood cell count. However, the psychiatrist testified that Ramirez Quevado is taking only a moderate dose of clozapine (525 milligrams, with the maximum dose being 900 milligrams). Further, lithium, which she is also taking, helps to maintain white blood cell count. The psychiatrist testified that Ramirez Quevado's white blood cell count has remained within the normal range, making this less of a concern when balanced against her compelling need for clozapine.

11

¶ 22 Finally, Ramirez Quevado suggests that her need for medication treatment is no longer as compelling because of how much she has improved and because the assaults she committed at the hospital were "remote" and "distant" past events. But that argument ignores the psychiatrist's testimony and the district court's finding that clozapine is the reason she has improved so significantly. And notably, Ramirez Quevado does not contest the district court's finding on the second Medina element that the medication treatment "is necessary to prevent a significant and long-term deterioration of [her] mental condition" and "is necessary to prevent the likelihood of [her] causing serious harm to others in the [hospital]."

## IV.   Disposition

¶ 23 The order is affirmed.

JUDGE FOX and JUDGE MEIRINK concur.